### ELIZA WALL

#### *v.*

### EDWARD F. C. YOUNG and C. WEAVER LOPER, receiver of the National Cordage Company.

Where it was made to appear that within the time limited for the presentation of claims to receivers of an insolvent corporation, a claimant made known her demand to the receivers by the commencement of a suit against them, and thereafter, while the suit was pending undetermined, entered into negotiations with a committee of creditors having charge of the reorganization of the business of the insolvent company and adjustment of its affairs, with which committee the receivers were in constant communication and co-operation, for the

settlement of the claim, and by reason of her confidence in an outcome of those negotiations which would satisfy her claim, neglected to make formal presentation of it to the receivers, within the time limited as aforesaid, and application having been made to the court to allow the presentation of the claim before distribution was made of the assets in the receivers' hands, and it having been made to appear that no embarrassment in the administration of the trust, which the receivers could not and should not have provided against, in view of their knowledge of the intention to urge the claim, had occurred, the claimant was permitted to present the claim beyond the time limited; but circumstances appearing which indicate that the claim may not, in whole or in part, be a just and equitable one though possibly in form legal, the presentation was allowed merely for the purpose of having the merits of the claim investigated, the right being reserved to hereafter admit it wholly or partially to a dividend, as justice and equity may require.

On petition for leave to present claim.

*Mr. Richard V. Lindabury*, for the claimant.

*Mr. William H. Corbin*, with whom was *Mr. John L. Cadwalader* (of New York), for the receivers.

THE CHANCELLOR.

The National Cordage Company, incorporated under the laws of this state, was adjudged by this court to be insolvent on the 4th of May, 1893, and Edward F. C. Young and G. Weaver Loper were appointed receivers, to administer its assets according to law. Later, by order of this court, the creditors of the company were required to present their claims and demands to the receivers on or before the 31st day of August, 1893.

In other states, the same gentlemen were appointed ancillary receivers, such ancillary appointment in New York being made by the United States circuit court for the southern district of that state.

The assets and liabilities of the company were very large.

Within a few days after the adjudication of insolvency, certain of the creditors and stockholders of the company agreed upon a committee of three gentlemen who should look after their interests and endeavor to bring about a reorganization of

the business of the insolvent company so that its value as a going, active concern, which activity gave principal value to its material assets, might be preserved to those who were pecuniarily interested in the company. That committee thoroughly familiarized itself with the affairs of the company by daily conferences with the receivers and an examination of the books, papers and property of the concern. They made industrious efforts to ascertain all the creditors and stockholders and to invite them to participate in a scheme to acquire and reorganize the business for the mutual benefit of all who should thus come in. After the expiration of the time limited by the court within which the claims of creditors should be presented, they were able, as they supposed, to know what creditors entitled to participation in the assets had joined in the scheme of reorganization, and finding that the great majority had united in it, they offered the receivers $5,000,000—about enough to pay the creditors one-third of their claims—for the entire assets and good will of the insolvent company, which sum was to be paid partly in the bonds of a new company to be formed to continue the business acquired, and partly in cash, under an arrangement with the creditors who had joined in the reorganization that the dividends paid by the receivers should go to the reorganization committee and that that committee would make settlements with them, as previously agreed upon, which should be favorable to the future of the new company. Thus, only a small portion of the $5,000,000 bid, necessary to pay the expenses of the receivership and dividends to a few creditors who refused to join in the new company, would be taken permanently from the reorganization committee. By this means a much larger price was had for the assets of the insolvent company than could be had by any other scheme of disposal, because it was impossible to find another bidder for the entirety, and abandonment of the going business, called "good will," so that the material assets might be sold in small parcels, predicated a much smaller realization, besides, whatever profit was had in that purchase enured to the benefit of those creditors and stockholders who concluded to venture in the scheme of reorganization, which was open to all.

The receivers reported the offer to the court, and, after all parties interested were heard, they were authorized to accept it, and sale was accordingly made.

After this sale, and before distribution of the assets, the petitioner, Eliza Wall, made her present application, which is that she may be allowed to present to the receivers a claim for $554,900, with interest, from the year 1890.

The receivers resist the application because they urge that it disturbs the calculations of the reorganization bidders, which were based upon the definite ascertainment of the creditors of the insolvent company through the instrumentality of the court's limitation of the presentation of claims, and because they claim that the petitioner, though well aware of the limitation upon the presentation of claims, for the purpose of securing the retirement of commercial paper upon which Mr. Wall's sons were liable, purposely refrained from presenting her claim until such retirement was had through the influence of the reorganization, regardless of the inconvenience and injury that a prosecution of her claim at the present time will create.

The origin of the claim of Eliza Wall appears, upon examination of the voluminous record, testimony and exhibits, which have been taken and produced, as follows:

Four parties, who theretofore had engaged in the manufacture of cordage and binder twine, by their officers and agents, caused the incorporation of the National Cordage Company, with purpose to effect a consolidation, and practically, a monopoly of the cordage and binder twine business throughout the United States. Those four parties were: The firm, L. Waterbury & Company, which consisted of James A. Waterbury and Chauncey Marshall; the firm, William Wall's Sons, which then consisted of Frank T. Wall, Eliza Wall and Michael W. Wall, but after April 3d, 1888, of Eliza Wall, Frank T. Wall, and Frank T. Wall and Edwin R. Brinkerhoff, trustees; the corporations, Tucker & Carter Cordage Company, of which John A Tucker was president, Edwin A. Johnson was secretary and William A. Tucker was treasurer, and the Elizabethport Cordage Com-

pany, of which Elisha M. Fulton was president, Francis Gilbert was secretary and Willard P. Whitlock was treasurer.

At the organization of the National Cordage Company, its capital stock consisted of fifteen thousand shares, of the par value of $100 each, making the entire capital $1,500,000, which, in 1890, appears to have been held as follows: James A. Waterbury and others, trustees for the several parties interested in the National Syndicate, fourteen thousand nine hundred and fifty-five shares; James M. Waterbury, C. P. Marsh, Frank T. Wall, Edwin R. Brinkerhoff, Elisha M. Fulton, Chauncey Marshall, John A. Tucker, Willard P. Whitlock and William Marshall, five shares each.

The individuals named, or some of them, were the directors of the company. The scheme of procedure, so far as it is material to the matter now in question, involved the lease of the manufacturing plants of each of the parties and the lease of other cordage manufactories to the National Cordage Company for a term of years, and the operation of these plants by the lessors under sub-leases back from the National Cordage Company to them, for the benefit of both the National Cordage Company and themselves, the latter company supplying the raw material and selling the product or fixing the prices at which it should be sold by the sub-lessees. Thus, the parties to the combination, through the instrumentality of the corporation of which, by means of the leases and sub-leases, they became dependents, bound themselves and others together so that they could not enter into competition as rivals and they would largely control the business in which they were engaged. To give that corporation strength and credit, each of the four firms or corporations thus interested from time to time loaned its liability in some form upon the commercial paper of the National Cordage Company, and thereby became the more firmly identified in interest with it. Extending the scope of the company, still other cordage factories were secured by profit-sharing contracts.

In August, 1890, the management determined to increase the capital stock of the National Cordage Company, and to that end

had its assets examined and valued in such a way that the valuation would appear to justify an increase of $13,500,000 in the capital stock.  Entering into this valuation was the acquirement of fees of the leased plants, in place of the leases, and covenants from the vendors which would restrain them from engaging in rival manufacturing.  The result of the scheme was, that, pursuing the forms of law, they increased the capital stock of the National Cordage Company to $15,000,000—$5,000,000 of preferred stock, with cumulative eight per cent. annual dividends, and $10,000,000 of common stock.  The plan was that the preferred stock should be devoted to securing the fees of the leased manufacturing plants and the new $8,500,000 of common stock should be distributed, by way of dividend, to the then existing stockholders, that is, the four manufacturing concerns mentioned, William Wall's Sons having a little less than one-seventh interest therein.  It was then that the company agreed for the purchase of the plant of William Wall's Sons for $954,900, payable on delivery of proper instruments of conveyance, and the plants of the other parties at corresponding figures.

Shortly after the agreement of sale, four thousand shares of the preferred stock, of the par value of $400,000, were transferred to William Wall's Sons in part payment of the $954,900 which, under the agreement, was to be paid to them.  The remaining $554,900 was not paid and, although the four thousand shares of preferred stock were passed over to William Wall's Sons, no formal conveyances of the plant of the National Cordage Company were delivered.  While the machinery and other personal property of the William Wall's Sons' plant were owned by the firm, the real estate used by it was the property of Frank T. Wall and the estate of Michael W. Wall, deceased, for which Frank T. Wall and Edwin R. Brinkerhoff were trustees.  The present claimant, Eliza Wall, does not appear to have had any interest in the real estate.

By the partnership articles of William Wall's Sons it was agreed that Frank T. Wall should have general charge of the business of the concern, and the exclusive right to sign the name of the firm, and under that power he appears to have agreed to

the sale of the plant. Mrs. Wall did not participate in the management of the business, but from time to time required statements of it to be rendered to her, and appointed agents to examine into the condition of the business. It appears that those agents had difficulty in getting the satisfaction they wished and were obstructed in their inquiries by the imperfect way in which the books of the firm were kept, but nevertheless enough appears to satisfy me that she was apprised of the fact that the firm of which she was a member was in the cordage combination referred to, and that because thereof it had a considerable advantage and profit, and I think that the plant of William Wall's Sons had been bargained to it, although she may not have known the particulars and full extent of the entanglement of her firm. Exactly how far the profits reconciled her to companionship with the syndicate, presently defined, does not appear with certainty.

The statements rendered to Mrs. Wall show that in 1890 the machinery and personal property agreed to be sold to the National Cordage Company were valued by the firm at less than $200,000, and that her interest in the partnership equaled about fifteen-sixteenths of its assets, which assets appeared to be made up of cash, merchandise, bills receivable, machinery, book accounts, interest in National Cordage Company stock and National Cordage Company indebtedness to the firm.

Early in October, 1891, the four parties (firms and corporations) organized a voluntary association which they called the "National Syndicate," but which operated under the name of L. Waterbury & Company, which is said to have been formed principally for the purpose of dealing in the stocks of the National Cordage Company, and on the 31st of that month, Frank T. Wall, acting for William Wall's Sons, assenting, the syndicate agreed that the National Cordage Company was indebted for unpaid purchase-price of their several plants, as follows : To L. Waterbury & Company, $570,579.90; to William Wall's Sons, $587,084.20; to the Tucker & Carter Cordage Company, $590,621.07, and to the Elizabethport Cordage Company, $390,947.07. And they also agreed that as they were members of a syndicate of stock-

holders of the National Cordage Company, and it was to the interest of all of them to transfer their claims against that company to the "National Syndicate" and take therefor obligation, of the syndicate, they would do so. Thereupon, this entry, among other entries, was made in the ledger of the National Cordage Company:

WM. WALL'S SONS—MILL ACCOUNT.

*Dr.*

1891.
Jany. 31. To cash paid.................................... $400,000  00
Oct.   31.  "  balance transferred to National Syn-
                dicate.................................... 587,084  20
                                                         ——————— $987,084  20

*Cr.*

1891.
Jany. 31. By value of fees, leases, contracts &c..... $954,900  00
Oct.   31.  "  interest to date.. .... ....................... 32,184  20
                                                         ——————— $987,084  20

A few days after the National Cordage Company became insolvent, the firm of William Wall's Sons was dissolved and went into liquidation.   Mrs. Wall assumed to be the liquidating partner, and acted under the advice of Messrs. Martin & Smith, a firm of lawyers in New York city, of which Mr. Pennington Whitehead was a member.   William Wall's Sons appear to have been involved by liability on paper of the National Cordage Company to the extent of more than five hundred thousand dollars, and Mrs. Wall and her lawyers deemed it to be wise, in the liquidation of its affairs, to act harmoniously with the other parties to the National Syndicate and the receivers and reorganization committee of the National Cordage Company, so that the paper on which this liability existed would be retired by the settlements and compromises brought about by those interests. To further this determination and ascertain the extent of the responsibility of William Wall's Sons and the ability of the National Cordage Company and the purpose of the reorganization committee and the remaining members of the syndicate, Mr. Whitehead was an almost daily visitor at the office of the

receivers of the National Cordage Company, and in communication with the counsel of the receivers and the reorganization committee. One of the counsel of the receivers testifies that at one of these visits, early in June, 1893, he handed Mr. Whitehead a notice of the order to limit the presentation of claims of creditors, which notice made known to Mr. Whitehead the time within which his clients might present claims to the receivers.

Mr. Whitehead testifies, on the other hand, that he is quite certain that the counsel referred to did not hand him a copy of the order limiting the presentation of claims, evidently meaning the paper to which counsel referred, which was not a copy of the order, but a notice of the order. It is evident, if the recollection of the receivers' counsel be correct, that the fact of the receipt of the notice escaped Mr. Whitehead's attention or recollection. Mr. Whitehead is a member of the bar of this state, and as such, was aware of the practice of this court in cases of insolvent corporations to make an order to limit the time within which the claims of creditors may be presented to receivers, in order, if allowed, to share in the moneys to be distributed. The likelihood of his expecting and watching for such an order, especially as it appears that he was acting for several other creditors of the insolvent company, is so conspicuous that it is difficult to understand how he failed to take notice of it. He explains his failure by the fact that through the commencement of a suit, he brought about negotiations with reference to a general settlement of the affairs of William Wall's Sons which included an adjustment of the claim in question.

The proofs demonstrate that he was intent, primarily, upon protecting William Wall's Sons, his client, Mrs. Eliza Wall, being the person most largely interested in that concern, from loss by reason of its liability upon some $512,000 of the National Cordage Company paper, and, secondly, upon securing her from either syndicate or cordage company whatever he could of the unpaid $554,900.

Looking to the accomplishment of these ends, on the 22d of July, 1893, he commenced suit in the supreme court of New York in behalf of Eliza Wall against the parties composing the

National Syndicate, corporations and individuals, and as well the National Cordage Company and the receivers of that company. The cause of action was based upon allegations of the sale of William Wall's Sons' plant to the National Cordage Company; of the formation of the National Syndicate, one purpose of which, it is alleged, was the appropriation to its own uses of the $954,900 to be paid for the William Wall's Sons' plant; that four thousand shares of preferred stock of the National Cordage Company was never lawfully delivered to William Wall's Sons, but was diverted to the syndicate, but that the $554,900, with interest, remains due; that an attempt was made to shift that indebtedness from the cordage company to the syndicate, but the proceeding in that respect was unlawful; that the syndicate had some stock-gambling claims against it which are unlawful, but which it nevertheless intended to pay from its assets, and thereby deplete them and endanger Mrs. Wall's recovery for the four thousand shares of preferred stock which was appropriated by the syndicate to its own uses. The complaint prayed, among other things, for an injunction to prevent any disposition of the assets of the syndicate; for a receiver of those assets; that the agreement of sale of William Wall's Sons' plant to the National Cordage Company may be decreed to be void; but if it should be decreed to be valid, that the receivers of the National Cordage Company might be decreed to pay her the amount to be paid therefor, $954,900 with interest, or a proper dividend on that sum.

The complaint in that suit, a summons and a rule to show cause why a receiver of the assets of the syndicate should not be appointed, together with a notice that application would be made to the United States circuit court for the southern district of New York for leave to maintain such suit against the receivers, were served upon Mr. Loper, one of the receivers, on the 22d of July, 1893.

Immediately after the commencement of that suit, the reorganization committee of the National Cordage Company and two or three individuals concerned in the National Syndicate, opened negotiations with Mr. Whitehead for a settlement of the

suit, which shortly resulted in an agreement to the effect that the assets of the syndicate should be transferred to trustees, who should use them in paying and compromising the debts of that association due to those who were not members of the syndicate, and then the syndicate's indebtedness to the four manufacturing concerns which participated in it, of which indebtedness the balance due for William Wall's Sons' plant, $554,900 and interest, should be first paid and go to Mrs. Wall, and, with the remaining indebtedness to the four concerns, $400,000, the par value of the four thousand shares of preferred stock, which was appropriated by the syndicate from William Wall's Sons, should share *pro rata*. If there should remain a surplus, it was to be divided so that William Wall's Sons would get a proportionate share of it. On the execution of such trust, among other things, the suit was to be discontinued and Mrs. Wall was to release the receivers of the National Cordage Company from all claims except those growing out of the commercial paper referred to, and was to confirm to them the title to the William Wall's Sons' plant. Among others, the receivers of the National Cordage Company and the reorganization committee were to be parties to a formal agreement of settlement which was to be prepared. Minute of the agreement thus arrived at was made by the counsel for the reorganization committee, who later disagreed and thereafter were unable to come together. The last conference between them was on the 17th of August. During September and October Mr. Whitehead was in Europe. Upon his return, in November, his attention was called to a printed statement by the receivers, which represented among the liabilities of the National Cordage Company this item: "Wm. Wall's Sons, $512,000." And thereupon he called upon one of the counsel for the receivers and asked whether that item represented the claim of William Wall's Sons or only their accommodation endorsements, and was told that it represented the latter. After that there was some further effort at compromise with members of the reorganization committee, but it was unsuccessful.

Pending all these negotiations for settlement, Mr. Whitehead

refrained from pressing his motion before the United States circuit court for permission to sue the receivers, but in January,
1894, after the negotiation failed, upon a new notice he applied
to that court and the receivers defaulting in appearance, obtained
the desired permission.  A few days later he realized that this
court had limited the time within which creditors' claims should
be presented to the receivers, and obtained a copy of the court's
order and finding that the time limited had expired four months
or more, he made the present application.

The testimony clearly shows that from the time the suit in the
supreme court of New York was commenced until after the sale
of the assets of the National Cordage Company, the reorganization committee had continually before it in the shape of the
unsettled suit of Mrs. Wall, notice of her purpose to press her
claim for the $554,900, with interest, against the National
Cordage Company.  If the receivers did not know of this purpose, it was because of negligence attributable to them.  The
complaint in the New York suit was served upon Mr. Loper
and by him handed to one of the counsel employed by the
receivers.  I cannot account for a failure to read and understand
it, upon any other hypothesis than negligence.  Mr. Whitehead's
fault was not concealment of his purpose, but failure to present
a formal claim, upon which the receivers might adjudicate,
within the time limited for the presentation of such claims.

It does not appear that this is a case of deliberate disregard of
the chancellor's order in subserviency to an ulterior purpose
detrimental to the trust administered, as was *Lee* v. *Green, 1 Dick.
Ch. Rep. 1;* nor does it appear that the failure to present the
claim was the result of careless indifference.  While it does
appear that during the delay the bulk of the commercial paper
upon which William Wall's Sons were liable was taken up by the
reorganization committee, and that thereby an achievement much
desired by Mrs. Wall was accomplished, it does not appear that
her claim now urged was withheld so that she might secure that
event.  On the contrary, her complaint in the New York suit
made it clear that it was her purpose to urge this claim.  Indeed,
by that suit she did urge it.  The neglect to take the course now

sought appears to me rather to have been the outcome of con-
fidence in the efficacy of the negotiations which followed the
commencement of the suit in New York, to secure the ends
wished for.   The application was made before any dividend was
paid by the receivers and consequently they retained enough to
accord it the same dividend that others have received, if it shall
be allowed.

The reorganization committee is not in position to complain
that the allowance of the claim will disturb its calculations, for
its members have known of the existence of the claim unsettled
throughout their entire workings.   I think that I should not
deny the application, but that I should at present admit the
claim, as was done in *Watjen* v. *Green, 3 Dick. Ch. Rep. 331,*
for the purpose of investigating its merit, not only as an
existing legal obligation of the National Cordage Company, but
also, if it be found to be a legal obligation, as a just charge for
the plant transferred, reserving the right to hereafter admit it
wholly or partially to a dividend, as justice and equity may
require.

The receivers' inventory exhibits that the present value of the
real estate is $157,950, and that the present value of the per-
sonal property is $242,575, making the whole $400,525, and
this valuation of the personalty I find exceeds the rating of it in
the various statements, from time to time rendered by Mrs.
Wall's partners to her, one of which was in the very year of the
sale.   These indications of the real value of the property,
together with the circumstances under which the agreement of
sale was made, which, to some extent, I have adverted to, impress
me that the price, $954,900, for the fee of a property which the
company already had secured by lease for ninety-nine years, may
have been so greatly and fraudulently in excess of the true value
that it will be inequitable as against other creditors and the cor-
poration itself to permit the unpaid balance of $554,900, in
whole or in part, to participate in the receivers' dividends.

In the claim which shall be presented for investigation, the
sale of the plant to the National Cordage Company must be
ratified by the claimants, because the attitude assumed in the
New York suit is one of hostility to its validity.